## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————— | : | |
|  | : | |
| **HABIBULLAH MANGUT** | : | **CIVIL ACTION** |
| **Petitioner,** | : | **(Habeas Corpus)** |
|  | : | |
| *v.* | : | |
|  | : | **ORAL ARGUMENT REQUESTED** |
| **GEORGE W. BUSH,** *et al.*, | : | |
| **Respondents.** | : | **No.  1:05-CV-01008** |
|  | : | **(Judge John D. Bates)** |
|  | : | |
| ——————————————— | : | |

## PETITIONER'S REPLY BRIEF IN SUPPORT OF MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR THE PETITIONER AND THE COURT WITH 30 DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO

NOW COMES petitioner, by and through undersigned counsel, and files this reply in support of his motion for an order requiring 30 days' advance notice of respondents' intended removal of petitioner from Guantanamo to a jurisdiction outside the United States.   A serious risk remains that, without the relief requested, respondents will "render" the petitioner and other Guantanamo detainees out of this Court's jurisdiction.  The harm to petitioner from being rendered into foreign custody is obvious and palpable.

1

Respondents claim in their brief that the Detainee Treatment Act, (Act) Pub. L. No. 109-148, Title X, 119 Stat. 2680 removes from this court jurisdiction to hear or consider this case. Petitioner disagrees with the respondents' assertion that this court has lost jurisdiction under the Act. No further reply on this assertion will be made due to the understanding that the district court prefers to await guidance from the D.C. Circuit.

Judges in this district hearing similar petitions have granted relief. On March 12, 2005, a temporary restraining order (TRO) was entered by the Hon. Rosemary M. Collyer in *Abdah, et al. v. Bush, et al.*, No. 04-1254 (HHK). *See* Exhibit A. Judge Collyer's TRO was supported by a written Memorandum Opinion, explaining how she believed each element of the four-part test for injunctive relief had been established. *See* Exhibit B. On March 29, 2005, the Hon. Henry H. Kennedy, Jr., granted the petitioner's Motion for a preliminary injunction and 30 days advance notice of transfer/removal. *See* Exhibit C. While the respondents argued that this TRO had been improperly entered based on *ex parte* facts it claimed were inaccurate, Judge Kennedy denied a motion to vacate that TRO. *See* Exhibit D. In addition, the Hon. Richard W. Roberts denied, in part, the respondents' motion for a stay in *Abdullah, et al. v. Bush, et al.*, No. 05-23 (RWR), noting that he would allow the petitioner to "seek emergency relief from this court in appropriate circumstances, such as when

2

petitioners have reason to believe that they are facing the possibility of continued detention at the request of the United States in a location that does not provide access to this court." *See* Exhibit E.  In *Al Joudi, et al. v. Bush, et al.*, No. 05-301 (GK) and *Al-Marri v. United States*, No. 04-2035 (GK), the Hon. Gladys Kessler found that the petitioners demonstrated their entitlement to a preliminary injunction. *See* Exhibits F through H.

Petitioner's requested relief does nothing more than preserve this Court's jurisdiction and ability to enforce its orders.  Respondents are simply wrong in claiming that this Court must stand aside, or even assist, while respondents transfer illegally-held prisoners into the custody of a torture-practicing foreign state, in violation of the United States' obligations under international and domestic law. Petitioner's motion should be granted.

## ARGUMENT AND CITATION OF AUTHORITIES

I.    All Four Balancing Factors Weigh in Petitioner's Favor,
      Especially Given the Limited Injunctive Relief They Seek

While respondents selectively quote judicial opinions for the proposition that preliminary injunctions are "extraordinary," Resp. Br. at 9, they fail to acknowledge the extraordinary facts of this entire situation.  In an *ordinary* case, a plaintiff is not held incommunicado by the respondent, is not wholly at the respondent's mercy, and is not at risk of being shipped off to a foreign country outside of the Court's

jurisdiction.  In an *ordinary* case, the plaintiff has the opportunity to present his own

testimony, and the respondent does not have the power to unilaterally deprive the

plaintiff of that right.  In an *ordinary* case involving a request for habeas relief, there

have typically been extensive prior legal proceedings subject to full judicial review,

and no discovery may therefore be necessary.  None of these "ordinary" facts exist

here.

Respondents also overstate the law concerning injunctive relief generally,

stating:

> To prevail in a request for a preliminary injunction, a
> movant "must 'demonstrate 1) a substantial likelihood of
> success on the merits, 2) that [he] would suffer irreparable
> injury if the injunction is not granted, 3) that an injunction
> would not substantially injure other interested parties, and
> 4) that the public interest would be furthered by the
> injunction.'"  *See* Katz v. Georgetown Univ., 246 F.3d 685,
> 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp.
> v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir.
> 1995).

Resp. Br. at 9.  The rule in this Circuit is not so strict.  *Washington Metro. Area*

*Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) ("An

order maintaining the status quo is appropriate when a serious legal question is

presented, when little if any harm will befall other interested persons or the public and

when denial of the order would inflict irreparable injury on the movant.  There is

substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success.").

        A.    It Cannot be Reasonably Disputed that Petitioner Will Suffer Irreparable Harm if They are Rendered to a Foreign Nation Without Notice or Any Opportunity to Be Heard

There is ample evidence both (1) that petitioner is subject to a very real risk of being rendered into the custody of a foreign government. Detainees have been transferred at a rate of 7 to 8 a month for the period of October of 2002 through June of 2005. Waxman Declaration ¶ 4. USA Today reported in August of 2005 that the Bush administration had agreed to transfer up to 110 Afghan detainees to prison facilities the United States would build or upgrade in Afghanistan. *See* Exhibit I. The Washington Times reported in September of 2005 that the United States would help finance construction of a locally run military prison in Afghanistan as part of a plan to release detainees to their home countries. The article quoted Mr. Waxman as a source. *See* Exhibit J.

The declaration respondents offer from Mr. Waxman itself acknowledges that it is the United States' policy to "transfer[] GTMO detainees under appropriate circumstances … to the control of other governments for continued detention, investigation and/or prosecution ... . *See* Resp. Br. Exh. A (Waxman Decl. at ¶ 3). Afghanistan is the country where petitioner would most likely be sent pursuant to any

transfer. The State Department reports "serious problems" in that there "were instances where local security forces and police committed extrajudicial killings, and officials used torture in prisons." 2004 County Report on Human Rights Practices, February 28, 2005, Afghanistan at 1 (Exhibit K).

Mr. Waxman also admits that transferee foreign governments include "the government of a detainee's home country, or a country other than the detainee's home country that may have law enforcement or prosecution interest in the detainee." Resp. Br. Exh. A (Waxman Decl. at ¶ 3). In this case, the home country for the petitioner is Afghanistan, a country where there are reports of torture in prisons.[1]

There are two distinct and equally important harms that would be suffered by petitioner if he were rendered to Afghanistan with no opportunity to challenge such a transfer. First, the respondents, after transferring the petitioner to Afghanistan, would surely turn around and argue that this Court no longer has jurisdiction over the case. Indeed, respondents all but admit this. *See* Resp. Br. at 11 citing *Almurbati v. Bush* 366 F. Supp.2d 72, 78 (D.D.C. 2005).[2] The Supreme Court has made it plain,

_____

[1]Petitioner does not concede that it would be proper for him to be rendered to some country other than Afghanistan. In this reply, Petitioner focuses on Afghanistan primarily because that is the country of his origin. The requested 30-day notice in advance of any transfer should allow petitioner adequate time to evaluate and address, if necessary, torture concerns at any specified location where he might be rendered.

[2]Petitioner does not agree that this argument by Respondents is necessarily correct. At a minimum, if the petitioner was transferred into the custody of a foreign state to be held and interrogated at the United States' direction, this Court's jurisdiction would continue.

however, that this Court presently has jurisdiction over petitioner's claims, and that such claims are actionable under United States law. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 n.15 (2004). The requested injunction does nothing more than preserve this Court's well-established jurisdiction over this dispute, and prevent the respondents from exercising self-help to avoid that jurisdiction by disposing of an inconvenient litigant.

Second, while respondents apparently deny that the government of Afghanistan routinely engages in torture, this position is simply contrary to the view held by the Department of State. On February 28, 2005, the U.S. State Department issued its 2004 Country Report on Human Rights Practices in Afghanistan, which contained, among other things, the following overall summary:

> The Government's human rights record remained poor; although there were some improvements in a few areas, serious problems remained. There were instances where local security forces and police committed extrajudicial killings, and officials used torture in prisons . . . Punishment of officials usually took the form of administrative actions rather than prosecution. Prolonged pretrial detention and poor prison conditions led to deteriorating health conditions and death among some prisoners . . . [v]iolence - including rape and kidnapping . . . continued.

Exhibit K at 1. The U.S. State Department's Report also laid out other disturbing details. Afghani torture was explicitly acknowledged. *E.g*., *id.* at 2,

Section 1.a. (" . . . on August 14, [2004] 17 bodies were discovered at the Shindand market place with evidence that 6 of the 17 individuals, including a 60 year old man, were tortured and beheaded."); *id.* ("On January 2, [2004], officials hanged four bandits in the central bazaar of Farah when they were arrested after a gunfight with government forces.  In March and April, while in police custody, four detainees in Herat were killed as the result of torture, according to the Afghan Independent Human Rights Commission (AIHRC)"); *id.* ("The Government and government-allied coalition forces carried out raids and attacks on alleged militant settlements that resulted in the deaths of civilians'); *id.* ("Rebel forces, including Taliban, al-Qa'ida, and Hizb-e-Islami Gulbuddin, killed numerous civilians during their attacks.  There were reports that the Taliban and its allies summarily executed NGO workers and other persons."); *id.* ("The Government made few efforts to bring to justice those persons responsible for the most serious abuses committed during the past 24 years."); *id.* at 3, Section 1.c. ("The Constitution prohibits such practices; however, there were reports of some abuses.  For example, there were continued reports that some local police authorities in Herat and other locations routinely employed torture on detainees . . . There was no followup to the 2002 incident in which Herat Governor Ismail Khan's security forces arrested journalist Mohammad Rafiq Shahir and reportedly beat him severely."); *id.* ("In March [2004], Human Rights Watch (HRW) claimed

that coalition forces operating in the country arbitrarily detained civilians and committed cruel, inhumane, and degrading acts against detainees."); *id.* at Section 1.g. ("There were no developments in the 2002 investigation of bodies of Taliban prisoners in Dasht-i Leili, where international experts found evidence of summary execution and death by suffocation.").

Moreover, the State Department recognized numerous other instances of abusive conditions. *See id.* ("Security forces reportedly used excessive force during their fight against the Taliban and al-Qa'ida remnants, including looting, beating, and torturing civilians. Violence and instability hampered relief and reconstruction efforts in different parts of the country and led to numerous human rights abuses.").

In evaluating respondents' comments on the importance of foreign countries' laws and "assurances" against torture, it is worth noting that the U.S. State Department has acknowledged Afghanistan's widespread failures to abide by its own laws and assurances. *See id.* at 3, Section 1.d. ("The Constitution prohibits arbitrary arrest or detention; however, arbitrary arrest and detention were serious problems . . . . Human rights groups reported that local police authorities extorted bribes from civilians in return for their release from prison or to avoid arrest."). Prison conditions were noted as being particularly poor. *See id.* ("Prison conditions remained poor, and there were reportedly many other secret or informal detention

centers in the country . . . . Prisoners lived in overcrowded, unsanitary conditions in collective cells and were not sheltered adequately from severe winter conditions. Prisoners were reportedly beaten, tortured, or denied adequate food. . . . The humanitarian NGO Emergency reported in January [2004] that infectious diseases were common among prisoners."); *id.* ("According to the AIHRC, six prisoners died in prison during the year, two from illness, and four others from injuries received during fights."); *id.* at 4 ("Private prisons were a problem.  The country's intelligence agency ran at least two prisons, and there were unconfirmed reports of private detention facilities around Kabul and in northern regions of the country.").  All of the statements noted above came from the United States Government itself.[3]

The respondents' own affidavits assert that "[t]he United States has no interest in detaining enemy combatants longer than necessary" Resp. Br. Exh. B Prosper Declaration ¶ 2.  Respondents' documented practice of transferring suspects outside the United States substantiates petitioner's fear of being deprived of United States judicial protection.  Moreover, whether petitioner is subject to a transfer tomorrow, or next week, or the week after that, such facts are exclusively within the control of

---

[3]Given these extensive, pointed, and highly negative comments about Afghanistan made in a formal United States report, the claims made by Respondent and their Declarants that U.S. diplomacy will be seriously and irreparably undermined by a mere procedure in which the petitioner's counsel would receive advance notice of a transfer, borders on the laughable. In any event, all such proceedings could be sealed.

the respondents.  There is substantial evidence of respondents transferring detainees.

Clearly, the petitioner has presented a sufficiently severe and substantial risk of harm

to justify the limited injunctive relief requested here.

B.    The Requested Injunction Would Cause
No Cognizable Harm to Respondents

The respondents, at page 8 of their brief, fail in their attempt to demonstrate

some theoretical "harm" to themselves, when they conjure a parade of horribles that

would supposedly result if they were enjoined from transferring the petitioner into the

custody of a foreign government without notice or any opportunity for petitioner to

be heard.  The requested injunction does not prevent or prohibit the respondents from

obtaining "assurances" from a foreign government, although such "assurances" appear

to be of limited value in any event.  *See Empty Promises: Diplomatic Assurances No*

*Safeguard Against Torture*, Human Rights Watch, Vol. 16, No. 4 (April 2004)

(Exhibit L).  Certainly, this Court may lift or modify an injunction if the respondents

can demonstrate a justification for doing so, and the *only* effect that an injunction

would have in this case would be to permit the petitioner to challenge a transfer, and

prevent the possible loss of this Court's jurisdiction, before that transfer takes place.

There is no legitimate fear of "disclosure" of confidential communications with

a foreign government.  Respondents' alleged in FN 6 that disclosure of their

assessments could chill important sources of information and interfere with the

11

conduct of foreign relations. Resp. Br. at 8. There can be no dispute that, in this case, secure facilities have been established, specifically for the handling, review and maintenance of sensitive classified information. Respondents have failed to identify any manner in which "sensitive" negotiations would be affected if they were "disclosed" only to the Court and counsel in this case, in the context of sealed communications reviewable only in the secure facilities that have already been established.

C.    <u>Public Policy Clearly Favors the Requested Information</u>

The respondents assert that they, and only they, can determine whether or when a Guantanamo detainee should be transferred to a foreign country, and that they will do so unless they, in their alleged sole and unreviewable discretion, find it "more likely than not" that the transferee "will" be tortured. Resp. Br. Exh. A (Waxman Decl. at ¶¶ 6, 7); Exh. B (Prosper Decl. at ¶ 4). In other words, respondents claim that this Court can do nothing to prevent the loss of its jurisdiction or the violation of applicable law, so long as the Secretary of the Navy, apparently, can convince himself that there is only a 50% chance that a detainee "will" (not may) be tortured.

Such claims of unfettered discretion have been repeatedly rejected by the federal courts in recent cases, including the Supreme Court's decision in *Rasul*, *supra*. As the United States District Court for the District of South Carolina astutely

12

observed, in rejecting yet another argument for unfettered executive discretion, "[c]ertainly, Respondent does not intend to argue here that, just because the President states that petitioner's detention is 'consistent with the laws of the United States …' that makes it so. Not only is such a statement in direct contravention to the well settled separation of powers doctrine, it is simply not the law." *Padilla v. Hanft*, Civil Action No. 2:04-2221-26-AJ, Opinion and Order at 18 (D.S.C., filed February 28, 2005) (Exhibit M). Regardless of how satisfied the Executive Branch may feel about its own decisions, when a federal litigant is properly before a Court that has exercised jurisdiction over the underlying claims in a case, that litigant must be provided a meaningful opportunity to contest a transfer seeking to place him outside the Court's jurisdiction.

For this reason, the Respondents' discussion of extradition proceedings is simply beside the point. *See* Resp. Br. at 18-20. This is not an "extradition" issue, for the Government in no way claims that the transfers or renderings it is utilizing in this context follow the formal process of extradition or its attendant procedural protections at all. Even if it were, petitioner also has raised a claim that his *current* detention is illegal under United States law, and the Supreme Court has expressly held that this Court has jurisdiction over petitioner's substantive claims. In sum, the "rule of non-inquiry" posited by the Respondents may or may not limit the inquiries conducted in

13

extradition proceedings, but this is not an extradition case, and the rule in any event cannot prevent federal courts from acting to protect their own jurisdiction over an underlying substantive claim in an already-existing case.

        D.    Petitioner's Underlying Claims Are Substantial and Should
                <u>Not be Terminated by the Respondents' Unilateral Actions</u>

While Respondents continue to steadfastly refuse to recognize the fact, there can be no real dispute that the petitioner has presented substantial claims that should be heard by this Court without unilateral interference by the Respondents.  The Supreme Court itself has noted the viability of petitioner's habeas corpus claim:

> Petitioners' allegations – that, although they have engaged neither in combat nor in acts of terrorism … they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing – unquestionably describe "custody in violation of the Constitution or laws or treaties of the United States."

*Rasul v. Bush*, 124 S. Ct. 2686, 2698 n.15 (2004) (citing 28 U.S.C. § 2241(c)(3)). Judge Green of this Court, in her January 31, 2005 Order in the consolidated Guantanamo Cases, followed the Supreme Court's direction and rejected many of the same arguments made by Respondents here.  Civil Action No. 02-0299 and consolidated cases (D.D.C., filed Jan. 31, 2005).  In particular, Judge Green found that the Guantanamo detainees in eleven consolidated cases stated viable claims under the

Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Third Geneva Convention.

The Supreme Court in *Rasul* confirmed this Court's jurisdiction, and Judge Green in the consolidated Guantanamo Cases ruled that valid claims exist. The issue, then, is not simply whether petitioner might, in the abstract, have standing to file a separate lawsuit alleging independent grounds to block the Government's planned transfers if they were not in Court otherwise.[4] Instead, the salient question is whether this Court, having already accepted jurisdiction over a live controversy, may act to preserve its jurisdiction already properly exercised. The answer to that question is clearly yes.

It is also important to note here that it is not clear that this motion will ever prevent any transfers the Government wishes to effect. Indeed, petitioner may never even try to prevent any future transfers. All that is sought here is the modest relief of 30 days' advance notice of the Government's intent to transfer the petitioner. If that

---

[4]Although unnecessary to the resolution of this motion, which does not ask this Court to rule on any substantive claims, petitioner continues to submit that he does possess such independent rights pursuant to the Geneva Conventions, as well as under articles 1 and 3 of the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, article 7 of the International Covenant on Civil and Political Rights, and article 5 of the American Convention on Human Rights, among other sources. As noted, however, no ruling on these issues is necessary – preliminary injunctive relief rarely resolves substantive rights; it merely preserves the status quo while the disputes are addressed in litigation.

motion is granted and the Government provides such notice, petitioner may well decide not to challenge the Government's proposed transfer.[5]  Alternatively, if the motion is granted, the Government may decide not to render this petitioner into another country's detention.  Thus, the Respondents' warnings of judicial interference in foreign policy decisions of the Executive Branch, and separation of powers concerns, are hollow, and premature, if not irrelevant at this stage.  In sum, the limited relief Plaintiffs' motion seeks is quite modest. In *el-Mashad, et al. v. Bush, et al.*, Case No. 1:05-cv-270 (JR), for example, the respondents stated in their pleadings that at least six weeks would elapse between any decision to transfer a detainee and the actual transfer.  *See* Resp. Mot. for Ext. of Time (Exhibit N), at 2.  Under such circumstances, it is obvious that this Court has the authority to preserve its jurisdiction by ordering Respondents to simply give notice of a decision already made, during this interim period, before the transfer is carried out.  The requested relief is similar to the requirement ordered by Judge Green in *Habib, et al. v. Bush, et al.*, No. 02-1130 (CKK) (Order of November 29, 2004) (Exhibit O) (denying TRO without prejudice, but noting that "[s]hould there be any chance that the circumstances upon which the Application was based will in fact arise, counsel for respondents shall provide counsel

---

[5]Indeed, if Mr. Waxman's statement about how most of the rendered detainees have since been released by foreign governments is correct, *see* Resp. Br. Exh. A (Waxman Decl. at ¶ 4), one can expect that most of the 30-day notices will *not* lead to transfer challenges – unless there is a true risk of torture.

for petitioner at least five business days of advanced notice, which should be sufficient time to allow counsel for petitioner to renew the Application.").

Given the very limited relief sought by petitioner here, and the severe harm petitioner would suffer if he lost meaningful access to this Court and were rendered to Afghanistan, the balance of factors to be considered by this Court weighs heavily in petitioner's favor, and the motion should be granted.

II.     Denial of the Motion Would Be Improper Before Discovery in Any Event

There can be no doubt that this Court may order discovery in a habeas corpus case.   Respondents must acknowledge that (a) petitioner has been held incommunicado and has not been allowed to speak even with his lawyers, and (b) the facts surrounding petitioner's potential transfer lie exclusively within the Respondents' possession.  The Respondents are seeking here to use their exclusive control of the facts as a weapon, by presenting this Court with generalities of supposed procedures while refusing disclosures of any details applicable to the petitioner himself.

The generalized procedures outlined by the Respondents, however, are not the last word on the subject.  It is becoming increasingly plain that United States security agencies have often been given *carte blanche* with respect to rendition, with the New York Times revealing a troubling, Executive Order:

17

The Bush Administration's secret program to transfer suspected terrorists to foreign countries for interrogation has been carried out by the Central Intelligence Agency under broad authority that has allowed it to act without case-by-case approval from the White House or the State or Justice Departments, according to current and former government officials.  The unusually expansive authority for the C.I.A. to operate independently was provided by the White House under a still-classified directive signed by President Bush within days of the September 11, 2001 attacks at the World Trade Center and the Pentagon, the officials said….

In recent weeks, several former detainees have described being subjected to coercive interrogation techniques and brutal treatment during months spent in detention under the program in Egypt and other countries. The official would not discuss specific cases, but did not dispute that there had been instances in which prisoners were mistreated.  The official said none had died….

The official refused to say how many prisoners had been transferred as part of the program.  But former government officials say that since the Sept. 11 attacks, the C.I.A. has flown 100 to 150 suspected terrorists from one foreign country to another, including to Egypt, Syria, Saudi Arabia, Jordan and Pakistan.

*Rule Change Lets C.I.A. Freely Send Suspects Abroad to Jails*, N.Y. Times, Mar. 6, 2005 (Exhibit P).  A front-page Washington Post article noted how "[t]he system the CIA relies on to ensure that the suspected terrorists it transfers to other countries will not be tortured has been ineffective and virtually impossible to monitor."  *See* Dana Priest, *CIA Assurances on Transferred Suspects Doubted,* Wash. Post. Mar. 17, 2005

18

(Exhibit Q).  The article notes how only verbal "assurances" are received from other

nations.  One C.I.A. official involved with renditions "called the assurances from

other countries 'a farce,'" Attorney General Alberto Gonzales was quoted as saying:

> [W]e can't fully control what that country might do.  We
> obviously expect a country to whom we have rendered a
> detainee to comply with their representations to us.  If
> you're asking me, 'Does a country always comply?'  I
> don't have an answer to that.

Of course, there is a certain "beauty" in such answers.  As one person interviewed in

the article noted, "It would be stupid [for the United States] to keep track of them

because then you would know what's going on…. It's really more like, 'Don't ask,

don't tell.'"  Others do tell, however.  One released detainee revealed how he had been

tortured in Egypt for six months after U.S. officials sent him there – "hung by his arms

from hooks, shocked, nearly drowned and brutally beaten."  One U.S. official who had

visited foreign prisons where suspects had been rendered stated, "It's widely

understood that interrogation practices that would be illegal in the U.S. are being

used."  The article noted how "[t]he CIA's Inspector General recently launched a

review of the rendition system."  *See also* Briefing Paper, *The United States'*

*"Disappeared": The CIA's Long-Term "Ghost Detainees"*, Human Rights Watch

(October 2004) (Exhibit R).

It would be inappropriate to give weight or credence to the admittedly generalized declarations Respondents bring to this Court, *see* Resp. Br. Exh. A (Waxman Decl. at ¶ 1) ("The following statements provide a general overview of the process"); *id.* Exh. B (Prosser Decl. at ¶ 1) ("The following statements provide a general overview of the Department of State's role"), while preventing petitioner from engaging in discovery to determine when, or if, those procedures will be applied. Despite their discussions of "policy," and comments about how non-torture assurances are "sought" in every transfer case, *id.* Exh. B (Prosser Decl. at ¶ ¶ 6, 7), both of Respondents' declarants ultimately acknowledge that, at the end of the day, "Decisions on transfer are made on a case-by-case basis." Resp. Br. Exh. A (Waxman Decl. at ¶ 7). *See also* Resp. Br. Exh. B (Prosper Decl. at ¶ 7) ("Decisions with respect to [the transfer of] Guantanamo detainees are made on a case-by-case basis."). And, of course, both declarants speak only of what they know about their own agencies' actions; their comments in no way address the recently-publicized, apparently active role of the CIA in America's rendition process.

Petitioner submits that he has established a strong and adequate basis for his motion to be granted. Nevertheless, given that the Respondents have sole possession of all the facts needed to successfully challenge a decision to render the petitioner to the custody of a foreign government, petitioner submits that this Court, if it is inclined

20

to deny this motion, should allow petitioner to engage in limited discovery in an effort to support their request for relief. That discovery should, at a minimum, permit petitioner to serve discovery and inquire of the Declarants or their successor as to the factual basis of their assertions.

CONCLUSION

For the foregoing reasons, petitioner respectfully requests this Court to grant the motion, to ensure that the Court retains jurisdiction over petitioner's claims, to allow for petitioner to meaningfully petition this Court, and to prevent the torture of petitioner.

Respectfully submitted,

/s/James V. Wade
James V. Wade (PA 33352)
Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
(James_Wade@fd.org)

Frederick W. Ulrich (PA 44855)
Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
(Fritz_Ulrich@fd.org)

Dated: January 24, 2006

22

## <u>CERTIFICATE OF SERVICE</u>

I, James V. Wade, certify that I have caused a true and accurate copy of the foregoing to be served upon the following persons, by first-class United States mail, in addition to the service that automatically occurs by virtue of my electronic filing of this document:

> Terry Henry, Esq., Senior Trial Attorney
> Andrew I. Warden, Esq., Trial Attorney
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., NW, Room 7144
> Washington, DC 20530

This 24th day of January, 2006

> /s/ James V. Wade_____
> James V. Wade