

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| JOSE PADILLA, | § | |
| Petitioner, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 2:04-2221-26AJ |
| | § | |
| COMMANDER C.T. HANFT, | § | |
| USN Commander, Consolidated Naval Brig, | § | |
| Respondent. | § | |

---

## MEMORANDUM OPINION AND ORDER

---

## I.    INTRODUCTION

This is a 28 U.S.C. § 2241 *habeas corpus* action.  The Court has jurisdiction over the matter

pursuant to 28 U.S.C. § 1331.  Pending before the Court is Petitioner's Motion for Summary

Judgment as to Counts One and Two.[1]  The sole question before the Court today is whether the

President of the United States (President) is authorized to detain an United States citizen as an enemy

combatant under the unique circumstances presented here.

---

[1]In Count One of the petition, Petitioner claims that his detention without being
criminally charged violates the United States Constitution, including the Fourth, Fifth and Sixth
Amendments, as well as the *habeas* suspension clause found in Article Two and the treason
clause found in Article III.  In Count Two of the petition, Petitioner maintains that his detention
violates the Non-Detention Act.  18 U.S.C. § 4001(a).

II.    **FACTUAL AND PROCEDURAL HISTORY**

A.    *Factual history*

The relevant facts as briefly recited by the Supreme Court in *Rumsfeld v. Padilla*, 124 S.Ct.

2711, 2715-16 (2004) are as follow:

> On May 8, 2002, Padilla flew from Pakistan to Chicago's O'Hare International Airport. As he stepped off the plane, Padilla was apprehended by federal agents executing a material witness warrant issued by the United States District Court for the Southern District of New York (Southern District) in connection with its grand jury investigation into the September 11th terrorist attacks. Padilla was then transported to New York, where he was held in federal criminal custody. On May 22, acting through appointed counsel, Padilla moved to vacate the material witness warrant.
>
> Padilla's motion was still pending when, on June 9, the President issued an order to Secretary of Defense Donald H. Rumsfeld designating Padilla an "enemy combatant" and directing the Secretary to detain him in military custody. App. D to Brief for Petitioner 5a (June 9 Order). In support of this action, the President invoked his authority as "Commander in Chief of the U.S. armed forces" and the Authorization for Use of Military Force Joint Resolution, Pub.L. 107-40, 115 Stat. 224 (AUMF),[2] enacted by Congress on September 18, 2001. June 9 Order 5a. The President also made several factual findings explaining his decision to designate Padilla an enemy combatant.[3] Based on these findings, the President concluded that it

---

[2]The AUMF provides in relevant part: "[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." 115 Stat. 224.

[3]In short, the President "[d]etermine[d]" that Padilla (1) "is closely associated with al Qaeda, an international terrorist organization with which the United States is at war;" (2) that he "engaged in . . . hostile and war-like acts, including . . . preparation for acts of international terrorism" against the United States; (3) that he "possesses intelligence" about al Qaeda that "would aid U.S. efforts to prevent attacks by al Qaeda on the United States"; and finally, (4) that he "represents a continuing, present and grave danger to the national security of the United

is "consistent with U.S. law and the laws of war for the Secretary of Defense to detain Mr. Padilla as an enemy combatant." *Id.*, at 6a.

That same day, Padilla was taken into custody by Department of Defense officials and transported to the Consolidated Naval Brig in Charleston, South Carolina.[4] He has been held there ever since.

Further, for the purposes of this proceeding, except where noted, the parties, in an October 20, 2004, filing with this Court titled "Stipulations of Fact," have agreed to the following facts:

1. On May 8, 2002, petitioner Padilla boarded a flight in Zurich, Switzerland, bound for O'Hare International Airport, Chicago, Illinois. Agents of the Federal Bureau of Investigation (FBI) had become aware of which flight petitioner would be taking from Zurich to Chicago and monitored petitioner during the flight and upon his arrival at O'Hare International Airport.[5]

2. At approximately 12:55 P.M. (C.D.T.),[6] May 8, 2002, the United States District Court for the Southern District of New York issued a material witness warrant for petitioner's arrest in connection with grand jury proceedings.

3. Petitioner arrived at O'Hare International Airport on the flight from Zurich at approximately 1:00 P.M. (C.D.T.), May 8, 2002, wearing civilian clothing and carrying no weapons or explosives.

4. Passengers arriving on international flights at O'Hare International Airport must proceed to the Federal Inspection Service (FIS) area within the international arrivals terminal. The FIS area contains both

---

States," such that his military detention "is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States." June 9 Order 5a-6a.

[4]Also on June 9, the Government notified the District Court *ex parte* of the President's Order; informed the court that it was transferring Padilla into military custody in South Carolina and that it was consequently withdrawing its grand jury subpoena of Padilla; and asked the court to vacate the material witness warrant. *Padilla ex rel. Newman v. Rumsfeld*, 233 F.Supp.2d 564, 571 (S.D.N.Y. 2002). The court vacated the warrant. Ibid.

[5] Petitioner does not stipulate to the content of paragraphs 1 and 2. Paragraphs 1 and 2 are factual averments of the respondent.

[6] Petitioner does not stipulate to the times indicated in any paragraph. The references to particular times are factual averments of the respondent.

3

an immigration inspection area and customs inspection area.

5. Passengers must first proceed to the immigration inspection area. Petitioner cleared the immigration inspection area where his United States passport was stamped "admitted" by an Immigration Inspector.

6. Petitioner then proceeded to the customs inspection area. After an initial interview with a Customs Inspector, petitioner was questioned further by Customs Inspectors in an interview room within the customs inspection area.

7. Subsequently, while remaining in the same interview room, petitioner was interviewed by FBI agents. Petitioner's interview with the FBI agents began at approximately 3:15 P.M. (C.D.T.).

8. At approximately 7:05 P.M. (C.D.T.), petitioner declined to continue the interview without the representation of an attorney.

9. At approximately 7:35 P.M. (C.D.T.), while remaining in the same interview room, petitioner was presented with a grand jury subpoena in connection with grand jury proceedings in the Southern District of New York.

10. At approximately 8:10 P.M. (C.D.T.), while remaining in the same interview room, petitioner was arrested by the interviewing agents pursuant to the material witness warrant that had been issued by the United States District Court for the Southern District of New York.

11. After his arrest, petitioner was transferred to the custody of the United States Marshals Service for detention. The United States Marshals Service transported petitioner to New York City and incarcerated him in the Metropolitan Correctional Center, a civilian facility.

12. On June 9, 2002, the district court vacated the material witness warrant and petitioner was transferred to military control.

*B.*    *Procedural history*

On June 11, Padilla's counsel, claiming to act as his next friend, filed in the Southern District a habeas corpus petition under 28 U.S.C. § 2241. The petition, as amended, alleged that Padilla's military detention violates the Fourth, Fifth, and Sixth Amendments and the Suspension Clause, Art. I, § 9, cl. 2, of the United States Constitution. The amended petition named as respondents President Bush, Secretary Rumsfeld, and Melanie A. Marr,[7] Commander of the Consolidated Naval Brig.

_____

[7]Commander Marr has since been replaced by Commander C.T. Hanft.

4

The Government moved to dismiss, arguing that Commander Marr, as Padilla's immediate custodian, is the only proper respondent to his habeas petition, and that the District Court lacks jurisdiction over Commander Marr because she is located outside the Southern District. On the merits, the Government contended that the President has authority to detain Padilla militarily pursuant to the Commander in Chief Clause of the Constitution, Art. II, § 2, cl. 1, the congressional AUMF, and this Court's decision in *Ex parte Quirin*, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942).

The District Court issued its decision in December 2002. *Padilla ex rel. Newman v. Bush*, 233 F.Supp.2d 564. The court held that the Secretary's "personal involvement" in Padilla's military custody renders him a proper respondent to Padilla's habeas petition, and that it can assert jurisdiction over the Secretary under New York's long-arm statute, notwithstanding his absence from the Southern District. *Id.*, at 581-587. On the merits, however, the court accepted the Government's contention that the President has authority to detain as enemy combatants citizens captured on American soil during a time of war. *Id.*, at 587-599.

The Court of Appeals for the Second Circuit reversed. 352 F.3d 695 (2003). The court agreed with the District Court that Secretary Rumsfeld is a proper respondent, reasoning that in cases where the habeas petitioner is detained for "other than federal criminal violations, the Supreme Court has recognized exceptions to the general practice of naming the immediate physical custodian as respondent." *Id.*, at 704-708. The Court of Appeals concluded that on these "unique" facts Secretary Rumsfeld is Padilla's custodian because he exercises "the legal reality of control" over Padilla and because he was personally involved in Padilla's military detention. *Id.*, at 707-708. The Court of Appeals also affirmed the District Court's holding that it has jurisdiction over the Secretary under New York's long-arm statute. *Id.*, at 708-710.

Reaching the merits, the Court of Appeals held that the President lacks authority to detain Padilla militarily. *Id.*, at 710-724. The court concluded that neither the President's Commander-in-Chief power nor the AUMF authorizes military detentions of American citizens captured on American soil. *Id.*, at 712-718, 722-723. To the contrary, the Court of Appeals found in both our case law and in the Non-Detention Act, 18 U.S.C. § 4001(a), a strong presumption against domestic military detention of citizens absent explicit

5

> congressional authorization. 352 F.3d, at 710-722. Accordingly, the court granted the writ of habeas corpus and directed the Secretary to release Padilla from military custody within 30 days. *Id.*, at 724. [The United States Supreme Court] granted the Government's petition for certiorari to review the Court of Appeals' rulings with respect to the jurisdictional and the merits issues, both of which raise[d] important questions of federal law. 540 U.S. ----, 124 S.Ct. 1353, 157 L.Ed.2d 1226 (2004).

*Padilla*, 124 S.Ct. at 2716-17 (footnotes omitted).

On June 28, 2004, the Supreme Court ruled "[t]he District of South Carolina, not the Southern District of New York, was the district court in which Padilla should have brought his habeas petition. We therefore reverse the judgment of the Court of Appeals and remand the case for entry of an order of dismissal without prejudice." *Id.* at 2727.

This case was commenced on July 2, 2004, with the filing of the petition discussed herein. Respondent filed his Answer on August 30, 2004.

On October 20, 2004, Petitioner filed a Motion for Summary Judgment to Counts One and Two of his Petition, as well as his Memorandum of Law in Support of the Motion (Petitioner's Motion). The parties jointly submitted their Stipulations of Fact on the same day. Subsequently, on November 22, 2004, Respondent filed his Opposition to Petitioner's Motion (Respondent's Opposition). Petitioner filed a Reply to Respondent's Opposition on December 13, 2004. Oral arguments were held on January 5, 2005. The case is now ripe for adjudication.

## III.   STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that

6

the moving party is entitled to a judgment as a matter of law." The moving party bears this initial burden of informing the Court of the basis for its motions, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court reviews the record by drawing all inferences most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)).

"Once the moving party carries its burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must show more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. If an adverse party completely fails to make an offer of proof concerning an essential element of that party's case on which that party will bear the burden of proof, then all other facts are necessarily rendered immaterial and the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322-23. Hence, the granting of summary judgment involves a three-tier analysis. First, the Court determines whether a genuine issue actually exists so as to necessitate a trial. FED. R. CIV. P. 56(e). An issue is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Second, the Court must ascertain whether that genuine issue pertains to material facts. FED. R. CIV. P. 56(e). The substantial law of the case identifies the material facts, that is, those facts that potentially affect the outcome of the suit. *Anderson*, 477 U.S. at 248. Third, assuming no genuine issue exists as to the material facts, the Court will decide whether the moving party shall prevail solely as a matter of law. FED. R. CIV. P. 56(e).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327. The primary issue is whether the material facts present a sufficient disagreement as to require a trial, or whether the facts are sufficiently one-sided that one party should prevail as a matter of law. *Anderson*, 477 U.S. at 251-52. The substantive law of the case identifies which facts are material. *Id.* at 248. Only disputed facts potentially affecting the outcome of the suit under the substantive law preclude the entry of summary judgment.

## IV.    CONTENTIONS OF THE PARTIES

Petitioner maintains that Congress has not authorized the indefinite detention without trial of citizens arrested in the United States. He also argues that the President's inherent constitutional powers do not allow him to subject United States citizens who are arrested in the United States to indefinite military detention.

Conversely, respondent contends that the President has the constitutional authority to detain Petitioner as an enemy combatant without charging him criminally. Furthermore, according to Respondent, the Non-Detention Act, 18 U.S.C. § 4001(a), does not constrain the President's authority to detain Petitioner as an enemy combatant.

8

V.    **DISCUSSION**

A.    *Three Supreme Court cases*

Respondent maintains that the decisions of the Supreme Court in *Hamdi v. Rumsfeld*, 124 S.Ct. 2633 (2004) and *Quirin*, 317 U.S. 1 "reaffirm the military's long-settled authority--independent of and distinct from the criminal process--to detain enemy combatants for the duration of a given armed conflict, including the current conflict against al Qaeda." Respondent's Opposition at 8. According to Respondent, "[t]hose decisions squarely apply to this case." *Id.* Petitioner, on the other hand, maintains that *Ex parte Milligan*, 71 U.S. (4 Wall) 2 (1866) is controlling. The Court will consider each case in turn.

1.    *Hamdi*

The petitioner in *Hamdi* was an American citizen captured while on the battlefield in Afghanistan. In that case, the Supreme Court had before it the threshold question of "whether the Executive has the authority to detain citizens who qualify as 'enemy combatants.'" *Hamdi,* 124 S.Ct. at 2639.

While the Court noted that there was some debate and no full exposition by the Government of the proper scope of the term "enemy combatant," it was clear in *Hamdi* that, the "enemy combatant that [the Government was] seeking to detain [was] an individual who, it allege[d], was part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi,* 124 S.Ct. at 2639 (internal quotation marks and citations omitted). The Court also noted that, "the basis asserted for detention by the military is that Hamdi was *carrying a weapon against American troops on a foreign battlefield*; that is, that he was an enemy combatant." *Id.* at 2642 n.1 (emphasis added).

9

Against this backdrop, the Supreme Court found that authority existed to detain Mr. Hamdi.

The Court reasoned,

> [t]here is no bar to this Nation's holding one of its own citizens as an enemy combatant. . . . A citizen, no less than an alien, can be "part of or supporting forces hostile to the United States or coalition partners" and "engaged in an armed conflict against the United States," Brief for Respondents 3; such a citizen, if released, would pose the same threat of returning to the front during the ongoing conflict.
>
> In light of these principles, it is of no moment that the AUMF does not use specific language of detention. Because detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war, in permitting the use of "necessary and appropriate force," Congress has clearly and unmistakably authorized detention *in the narrow circumstances considered here.*

*Hamdi*, 124 S.Ct. at 2640-41 (emphasis added).

Thus, it is true that, under some circumstances, such as those present in *Hamdi*, the President can indeed hold an United States citizen as an enemy combatant. Just because something is sometimes true, however, does not mean that it is always true. The facts in this action bear out that truth.

In the instant case, Respondent would have this Court find more similarities between Petitioner here and the petitioner in *Hamdi* than actually exist. As two other courts have already found, however, the differences between the two are striking.

The first to distinguish the difference was Judge Wilkinson when he noted that "[t]o compare this battlefield capture [in *Hamdi*] to the domestic arrest in *Padilla v. Rumsfeld* is to compare apples and oranges." *Hamdi v. Rumsfeld*, 337 F.3d 335, 344 (4th Cir. 2003) (Wilkinson, J., concurring). Not long thereafter, the Supreme Court, in responding to Justice Scalia's dissent, specifically noted

10

"Justice Scalia largely ignores the context of [*Hamdi*]: a United States citizen captured in a *foreign*

combat zone." *Hamdi*, 124 S.Ct at 2643 (emphasis in original).[8]

Nevertheless, Respondent would have the Court find that the place of capture is of no

consequence in determining whether the President can properly hold Petitioner as an enemy

combatant. According to that view, it would be illogical to find that Petitioner could evade his

detention as an enemy combatant status just because he returned to the United States before he could

be captured. The cogency of this argument eludes the Court.

In *Hamdi*, the petitioner was an American citizen who was captured on the battlefield.

Petitioner is also an American citizen, but he was captured in an United States airport. He is, in

some respects, being held for a crime that he is alleged to have planned to commit in this country.[9]

---

[8]In fact, in the plurality opinion, Justice O'Connor noted at least nine additional times that the Court's holding that Mr. Hamdi's detention as an enemy combatant was constitutionally permissible was limited to the facts of that case. *Id.* at 2635 ("Congress authorized the detention of combatants in the *narrow circumstances* alleged here.") (emphasis added); *Id.* at 2639 ("We therefore answer only the *narrow question* before us.") (emphasis added); *Id.* at 2639-40 ("[W]e conclude that the AUMF is explicit congressional authorization for the detention of individuals in the *narrow category* we describe.") (emphasis added); *Id.* at 2640 ("We conclude that the detention of individuals falling within the *limited category* we are considering . . . is an exercise of the 'necessary and appropriate force' Congress has authorized the President to use.") (emphasis added); *Id.* at 2641 ("Congress has clearly and unmistakably authorized detention in the *narrow circumstances* considered here.") (emphasis added); *Id.* at 2642 ("*Ex parte Milligan* . . . does not undermine our holding about the Government's authority to seize enemy combatants, *as we define that term today*.") (emphasis added); *Id.* at 2642 n.1 ("Here the basis asserted for detention by the military is that Hamdi was *carrying a weapon against American troops on a foreign battlefield*; that is, that he was an enemy combatant.") (emphasis added); *Id.* at 2643 (noting with disapproval that "Justice Scalia finds the *fact of battlefield capture* irrelevant. . . .") (emphasis added); *Id.* ("Justine Scalia can point to no case or other authority for the proposition that those *captured on a foreign battlefield* . . . cannot be detained outside the criminal process.") (emphasis added).

[9]The Court finds Respondent's argument concerning whether Petitioner had actually entered the country unavailing. Respondent has not provided, and this Court has not found, any case law that supports Respondent's position that an United States citizen, is not "in" the United

No one could rightfully argue that "[t]he exigencies of military action on the battlefield present an entirely different set of circumstances than the arrest of a citizen arriving at O'Hare International Airport." Brief of *Amici Curiae* Janet Reno et al. at 5, *Padilla*, 124 S.Ct. 2711 (No. 03-1027).

It cannot be disputed that the circumstances in *Hamdi* comport with the requirement of the AUMF, which provides that "the President is authorized to use all *necessary and appropriate force* against those . . . persons, in order to prevent attacks by al Qaeda on the United States." That is, the President's use of force to capture Mr. Hamdi was necessary and appropriate. Here, that same use of force was not.

Again, Petitioner in this action was captured in the United States. His alleged terrorist plans were thwarted at the time of his arrest. There were no impediments whatsoever to the Government bringing charges against him for any one or all of the array of heinous crimes that he has been effectively accused of committing. Also at the Government's disposal was the material witness warrant. In fact, the issuance of a material witness warrant was the tool that the law enforcement officers used to thwart Petitioner's alleged terrorist plans. Therefore, since Petitioner's alleged terrorist plans were thwarted when he was arrested on the material witness warrant, the Court finds that the President's subsequent decision to detain Petitioner as an enemy combatant was neither necessary nor appropriate. As accurately observed by counsel for Petitioner,

> [i]t's not necessary because the criminal justice system provides for the detention power. Nothing makes that clearer than the facts of this case. There was a warrant issued from a grand jury for Mr. Padilla's arrest. Mr. Padilla was arrested by law enforcement officials, civilian law enforcement officials. He was brought before a civilian judge. He was imprisoned in a civilian facility in New York. Everything

---

States when he or she is "in" a United States airport. Such a failure is fatal to the claim.

12

> occurred according to the civilian process in the way it is supposed to.
> And it's not only not necessary, but not appropriate.  It's not
> appropriate because it directly conflicts with the limits on detention
> that [C]ongress has set by statute and the limits that the framers set on
> presidential power.

Transcript of January 5, 2005 hearing at 5:6-5:17.

### 2.    *Quirin*

*Quirin* involves the *habeas* petitions of seven German soldiers, all of whom had lived in the United States at some point in their lives.  The soldiers came to the United States bent on engaging in military sabotage.  One of the seven, Haupt, claimed to be an American citizen.

In denying the soldiers' petitions, the Supreme Court held that "Citizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war."  *Id.* at 37.

Respondent maintains that that *Quirin* is wholly on point and, thus, for purposes of this motion, is controlling.  The Court is unconvinced.

Although seemingly similar to the instant case, it is, in fact, like *Hamdi*, starkly different.  As the Second Circuit has already noted, "the *Quirin* Court's decision to uphold military jurisdiction rested on the express congressional authorization of the use of military tribunals to try combatants who violated the law."  *Hamdi*, 352 F.3d 695, 715-16.

> From the very beginning of its history this Court has recognized and
> applied the law of war as including that part of the law of nations
> which prescribes, for the conduct of war, the status, rights and duties
> of enemy nations as well as of enemy individuals.  By the Articles of
> War, and especially Article 15, Congress has explicitly provided, so
> far as it may constitutionally do so, that military tribunals shall have
> jurisdiction to try offenders or offenses against the law of war in
> appropriate cases.  Congress, in addition to making rules for the
> government of our Armed Forces, has thus exercised its authority to
> define and punish offenses against the law of nations by sanctioning,
> within constitutional limitations, the jurisdiction of military
> commissions to try persons for offenses which, according to the rules

13

> and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals. And the President, as Commander in Chief, by his Proclamation in time of war has invoked that law. By his Order creating the present Commission he has undertaken to exercise the authority conferred upon him by Congress, and also such authority as the Constitution itself gives the Commander in Chief, to direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war.

*Quirin*, 317 U.S. at 27-28 (footnote omitted).

Respondent goes to great lengths to argue that the Court is *Quirin* did not rest its decision on a "clear statement from Congress." Respondent's Opposition at 22. The Court is unconvinced.

Contrary to Respondent's argument, it is clear from *Quirin* that the Court found that Congress had "explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases." *Id.* at 28. Therefore, since no such Congressional authorization is present here, Respondent's argument as to the application of *Quirin* must fail.[10]

### 3.    *Ex parte Milligan*

> The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all

---

[10]Other differences include, but are not limited to, the fact that:

1) In *Quirin*, Mr. Quirin was charged with a crime and tried by a military tribunal. In the instant case, Petitioner has not been charged and has not been tried.

2) *Quirin* involves a prisoner whose detention was punitive whereas Petitioner's detention is purportedly preventative.

3) *Quirin* is concerned more with whether the petitioner was going to be tried by a military tribunal or a civilian court. The case at bar is concerned with whether Petitioner is going to be charged and tried at all.

4) The decision in *Quirin* preceded the Non-Detention Act.

5) *Quirin* involved a war that had a definite ending date. The present war on terrorism does not.

14

circumstances.    No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.  Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence.

*Id.* at 12-21.

*Ex parte Milligan* involves a United States citizen during the Civil War who was neither a resident of one of the Confederate states, nor a prisoner of war, but a citizen of Indiana for twenty years. He had never been in the military or naval service.  Milligan was arrested while at home.

The Court held in *Milligan* that the military commission lacked any jurisdiction to try Milligan when the civilian "courts are open and their process unobstructed." *Id.* at 121. The President may not unilaterally establish military commissions in wartime "because he is controlled by law, and has his appropriate sphere of duty, which is to execute, not to make, the laws." *Id.* at 121.[11]

---

[11]The court in *Hamdi*, 124 S.Ct. at 2642, observed, however, that the *Milligan* court made repeated reference to the fact that its inquiry into whether the military tribunal had jurisdiction to try and punish Milligan turned in large part on the fact that Milligan was not a prisoner of war, but a resident of Indiana arrested while at home there.  That fact was central to its conclusion.  Had Milligan been captured while he was assisting Confederate soldiers by carrying a rifle against Union troops on a Confederate battlefield, the holding of the Court might well have been different.  The Court's repeated explanations that Milligan was not a prisoner of war suggest that had these different circumstances been present he could have been detained under military authority for the duration of the conflict, whether or not he was a citizen.

(citation and footnote omitted).

While not directly on point, and limited by *Quirin*, *Milligan's* greatest import to the case at bar is the same as that found in *Quirin*: the detention of a United States citizen by the military is disallowed without explicit Congressional authorization.

> B.    *The Non-Detention Act, 18 U.S.C. § 4001(a)*

The Non-Detention Act, also referred to as the "Railsback Amendment," after its author Representative Railsback, provides that "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a).

Respondent asserts that the Non-Detention Act does not constrain the President's authority to detain Petitioner as an enemy combatant. He contends that 1) the Joint Resolution for Authorization for Use of Miliary Force (AUMF), passed by Congress on September 18, 2001, is an "Act of Congress" authorizing Petitioner's detention and 2) the Non-Detention Act does not apply to the military's detention of the military's wartime detention of enemy combatants to fulfill this statute. The Court finds these contentions to be without merit.

> 1.    *Authorization*

The AUMF provides, in relevant part, that

> [t]he President is authorized to use all *necessary and appropriate*
> force against those nations, organizations, or persons he determines
> planned, authorized, committed, or aided the terrorist attacks that
> occurred on September 11, 2001, or harbored such organizations or
> persons, in order to prevent any future acts of international terrorism
> against the United States by such nations, organizations or persons.

Joint Resolution § 2(a) (emphasis added).

When interpreting a statute, this Court begins "where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). In clear and unambiguous language, the Non-Detention Act forbids *any* kind of detention of an

16

United States citizen, except that which is specifically allowed by Congress. *Howe v. Smith*, 452

U.S. 473, 479 n.3 (1981) ("[T]he plain language of § 4001(a) proscrib[es] detention of *any kind* by

the United States, absent a congressional grant of authority to detain.") (emphasis in original).

Contrary to Respondent's contentions otherwise, the Court finds that 1) the AUMF does not

authorize Petitioner's detention and 2) Petitioner's present confinement is in direct contradiction to

the mandate of the Non-Detention Act.

> As the Second Circuit stated,

>> While it may be possible to infer a power of detention from the Joint
>> Resolution in the battlefield context where detentions are necessary
>> to carry out the war, there is no reason to suspect from the language
>> of the Joint Resolution that Congress believed it would be authorizing
>> the detention of an American citizen already held in a federal
>> correctional institution and not arrayed against our troops in the field
>> of battle.

*Padilla*, 352 F.3d at 723 (internal quotation marks and citation omitted).

To be more specific, whereas it may be a necessary and appropriate use of force to detain a

United States citizen who is captured on the battlefield, this Court cannot find, in narrow

circumstances presented in this case, that the same is true when a United States citizen in arrested

in a civilian setting such as an United States airport.

In sum, "[i]n interpreting a war-time measure we must assume that [the purpose of Congress

and the Executive] was to allow for the greatest possible accommodation between those liberties and

the exigencies of war." *Ex parte Endo*, 323 U.S. 283, 300 (1944). "We must assume, when asked

to find implied powers in a grant of legislative or executive authority, that the law makers intended

to place no greater restraint on the citizen than was clearly and unmistakably indicated by the

language they used." *Id.* In the case *sub judice*, there is no language in the AUMF that "clearly and

unmistakably" grants the President the authority to hold Petitioner as an enemy combatant. Therefore, Respondent's argument must fail.[12]

Respondent next argues that,

> Even if there were any doubt about whether the AUMF encompasses combatants seized within the United States, such doubt would be resolved in favor of the President's determination that Congress did in fact authorize petitioner's detention. President's Order, Preamble (declaring that petitioner's detention is "consistent with the laws of the United States, including the Authorization for Use of Military Force").

Respondent's Opposition at 26.

Certainly Respondent does not intend to argue here that, just because the President states that Petitioner's detention is "consistent with the laws of the United States, including the Authorization for Use of Military Force" that makes it so. Not only is such a statement in directcontravention to the well settled separation of powers doctrine, it is simply not the law. Moreover, such a statement is deeply troubling. If such a position were ever adopted by the courts, it would totally eviscerate the limits placed on Presidential authority to protect the citizenry's individual liberties.

### 2. Application to wartime detention

In arguing that the Non-Detention Act has no application to Petitioner, Respondent first maintains that the placement the Act – in Title 18 ("Crimes and Criminal Procedure"), with directions regarding the Attorney General's control over federal prisons, and not in Title 10 ("Armed Forces") or Title 50 ("War and National Defense") – indicates that it speaks only to civilian detentions. Second, Respondent argues that the legislative history of the Non-Detention Act renders the same result. The Court is unpersuaded by either argument. Simply stated, the statute is clear,

---

[12]To the extent that Respondent maintains that the Non-Detention Act was impliedly repealed by the AUMF, the Court rejects the argument. It is black letter law that repeal of a statute by implication is strongly disfavored in the law.

simple, direct and ambiguous.  It forbids *any* kind of detention of an United States citizen, except

that it be specifically allowed by Congress.  Therefore, since Petitioner's detention has not been

authorized by Congress, Respondent's argument must again fail.

C.    *Inherent authority*

Having found that the Non-Detention Act expressly forbids the President from holding

Petitioner as an enemy combatant, and that the AUMF does not authorize such detention, neither

explicitly nor by implication, the Court turns to the question of whether the President has the

inherent authority to hold Petitioner.

Respondent states that

> The Commander-in-Chief Clause grants the President the power to
> defend the Nation when it is attacked, and he "is bound to accept the
> challenge without waiting for any special legislative authority." *The
> Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862).  An essential aspect
> of the President's authority in this regard is to "determine what degree
> of force the crisis demands." *Id.* at 670; see *Campbell v. Clinton*, 203
> F.3d 19, 27 (D.C. Cir.) (Silberman, J., concurring) ("[T]he President
> has independent authority to repel aggressive acts by third parties
> even without specific congressional authorization, and courts may not
> review the level of force selected."), cert. denied, 531 U.S. 815
> (2000).  The President's decision to detain petitioner as an enemy
> combatant represents a basic exercise of his authority as Commander
> in Chief to determine the level of force needed to prosecute the
> conflict against al Qaeda.

Respondent's Opposition at 10.

As a preliminary matter, the Court strongly agrees that "great deference is afforded the

President's exercise of his authority as Commander-in-Chief." *Hamdi*, 352 F.3d at 712 (internal

citation omitted).  However, "[w]here the exercise of Commander-in-Chief powers, no matter how

well intentioned, is challenged on the ground that it collides with the powers assigned by the

Constitution to Congress, a fundamental role exists for the courts." *Hamdi*, 352 F.3d at 713 (citing

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

19

Pursuant to the seminal case of *Youngstown Sheet & Tube v. Sawyer,* 343 U.S. 579 (1952), in a case such as this, where the President has taken steps that are inconsistent with the will of Congress – both express and implied – the President's authority is "at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown,* 343 U.S. at 637.

Simply stated, Respondent has not provided, and this Court has not found, any law that supports the contention that the President enjoys the inherent authority pursuant to which he claims to hold Petitioner. The *Prize* cases are chiefly concerned with enemy property, not enemy combatants, and *Campbell* concerns air strikes in another country. Obviously, neither of those issues are present here. Thus, the Court finds the two cases of little guidance.

As Justice Jackson stated, "Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy." *Youngstown,* 343 U.S. at 644 (Jackson, J., concurring). "There are indications that the Constitution did not contemplate that the title Commander-in-Chief of the Army and Navy will constitute [the President] also Commander-in-Chief of the country, its industries and its inhabitants. *Id.* at 643-44.

Accordingly, and limited to the facts of this case, the Court is of the firm opinion that it must reject the position posited by Respondent. To do otherwise would not only offend the rule of law and violate this country's constitutional tradition, but it would also be a betrayal of this Nation's commitment to the separation of powers that safeguards our democratic values and individual liberties.

For the Court to find for Respondent would also be to engage in judicial activism. This Court sits to interpret the law as it is and not as the Court might wish it to be. Pursuant to its interpretation,

the Court finds that the President has no power, neither express nor implied, neither constitutional nor statutory, to hold Petitioner as an enemy combatant.

D.    *Other matters and concerns*

1.    *A law enforcement matter*

It is true that there may be times during which it is necessary to give the Executive Branch greater power than at other times.  Such a granting of power, however, is in the province of the legislature and no one else – not the Court and not the President.  "The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times."  *Youngstown*, 343 U.S. at 589.  "[A] state of war is not a blank check for the President when it comes to the rights of the Nation's citizens."  *Hamdi*, 124 S.Ct. at 2650 (internal citation omitted).

Simply stated, this is a law enforcement matter, not a military matter.  The civilian authorities captured Petitioner just as they should have.  At the time that Petitioner was arrested pursuant to the material arrest warrant, any alleged terrorist plans that he harbored were thwarted.  From then on, he was available to be questioned –and was indeed questioned – just like any other citizen accused of criminal conduct.  This is as it should be.

There can be no debate that this country's laws amply provide for the investigation, detention and prosecution of citizen and non-citizen terrorists alike.  For example, in his dissenting opinion in *Hamdi*, 124 S.Ct. at 2664, Justice Scalia lists the following criminal statutes that are available to the Government in fighting terrorism: 18 U.S.C. § 2381(the modern treason statute which essentially tracks the language of the constitutional provision); 18 U.S.C. § 32 (destruction of aircraft or aircraft facilities); 18 U.S.C. § 2332a (use of weapons of mass destruction); 18 U.S.C. § 2332b (acts of terrorism transcending national boundaries); 18 U.S.C. § 2339A (providing material support to terrorists); 18 U.S.C. § 2339B (providing material support to certain terrorist organizations); 18

U.S.C. § 2382 (misprision of treason); 18 U.S.C. § 2383 (rebellion or insurrection); § 2384 (seditious conspiracy); 18 U.S.C. § 2390 (enlistment to serve in armed hostility against the United States); 31 CFR § 595.204 (2003) (prohibiting the "making or receiving of any contribution of funds, goods, or services" to terrorists); and 50 U.S.C. § 1705(b) (criminalizing violations of 31 CFR § 595.204). In his concurrence, in addition to these statutes, Justice Souter lists 18 U.S.C. § 3142(e) (pretrial detention). *Id.* at 2657.[13]

> [I]n declaring Padilla an enemy combatant, the President relied upon facts that would have supported charging Padilla with a variety of offenses. The government thus had the authority to arrest, detain, interrogate, and prosecute Padilla apart from the extraordinary authority it claims here. The difference between invocation of the criminal process and the power claimed by the President here, however, is one of accountability. The criminal justice system requires that defendants and witnesses be afforded access to counsel, imposes judicial supervision over government action, and places congressionally imposed limits on incarceration.

*Amici Curiae* at 3.

    2.    *Suspension of the writ of habeas corpus*

"The Privilege of the Writ of *Habeas Corpus* shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Const. Art. 1, § 9, cl. 2. This power belongs solely to Congress. Since Congress has not acted to suspend the writ, and neither the President nor this Court have the ability to do so, in light of the findings above, Petitioner must be released.

---

[13]As for concerns about national security during the judicial process, it is axiomatic that the government has a legitimate interest in the protection of the classified information that may be necessarily be used in the prosecution of an alleged terrorist such as Petitioner. This Court is of the firm opinion, however, that federal law provides robust protection of any such information. *E.g.* The Classified Information Procedures Act (CIPA), 18 U.S.C. App. III.

### 3.    Other measures

If the law in its current state is found by the President to be insufficient to protect this country from terrorist plots, such as the one alleged here, then the President should prevail upon Congress to remedy the problem. For instance, if the Government's purpose in detaining Petitioner as an enemy combatant is to prevent him from "returning to the field of battle and taking up arms once again[,]" *Hamdi,* 124 S.Ct at 2640, but the President thinks that the laws do not provide the necessary and appropriate measures to provide for that goal, then the President should approach Congress and request that it make proper modifications to the law. As Congress has already demonstrated, it stands ready to carefully consider, and often accomodate, such significant requests.

## VI.    CONCLUSION

Accordingly, in light of the foregoing discussion and analysis, it is the judgment of this Court that Petitioner's Motion for Summary Judgment on Counts One and Two of the Petition, as well as his Petition for a writ of *habeas corpus* must be **GRANTED**. Accordingly, Respondent is hereby directed to release Petitioner from his custody within forty-five (45) days of the entry of this Order.[14]

**IT IS SO ORDERED**.

Signed this 28th day of February, 2005, in Spartanburg, South Carolina.

s/ Henry F. Floyd
HENRY F. FLOYD
UNITED STATES DISTRICT JUDGE

---

[14]Of course, if appropriate, the Government can bring criminal charges against Petitioner or it can hold him as a material witness.

23